IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:07cv00277 |
| | ) | |
| $7,000.00 in U.S. CURRENCY | ) | |
| | ) | |
| and | ) | |
| | ) | |
| 2003 NISSAN 350Z, | ) | |
| VIN JN1AZ34E43TOO2843, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

This is a forfeiture action pursuant to 21 U.S.C. §§
881(a)(4) and 881(a)(6) and 18 U.S.C. § 981(a)(1)(C). Before
the court are various motions by Kendal Brumby a/k/a Ken d El
Bey ("El Bey") and Joseph Brumby, Jr., a/k/a Yasir Justice El
Bey ("Brumby") seeking release of the seized defendant property,
and motions by the Government to dismiss or strike their claims.
For the reasons set forth below, the court dismisses El Bey's
claim as frivolous, strikes Brumby's claims, and otherwise
denies their motions.

**I.  BACKGROUND**

At approximately 2:06 p.m. on November 20, 2006, Deputy S.
Canter of the Guilford County Sheriff's Office stopped a 2003

Nissan 350Z automobile, occupied solely by driver Brumby, for speeding. (Doc. 1 Ex. A ¶ 3.) Upon conducting a computerized check of the driver's license, Deputy Canter learned that Brumby had an outstanding warrant for arrest and placed him under arrest. (Id. ¶¶ 3-4.) Deputy Canter searched the vehicle incident to the arrest and located four bundles of thousands of dollars in U.S. currency inside a leather satchel on the passenger seat. (Id. ¶¶ 4, 6.) Because the currency was bundled in a fashion and in amounts suggestive of illegal drug activity, Deputy Canter had the car searched by a narcotic-detecting canine, "Rico," who positively alerted to the odor of narcotics in the leather satchel which contained the currency and in the passenger side rear seat/speaker area. (Id. ¶ 5.) Officers discovered a non-factory hidden compartment behind the driver's rear speaker which was about two feet square and controlled by two electric motors. (Id.) Although Rico positively alerted to this area, no contraband was found. (Id.)

Brumby told the officers at the scene that the currency was from his rental property business, "Showtime Realty," and that he was on his way to deposit it into his bank account. (Id. ¶ 7.) According to the officers, Brumby said that he had collected the money over a period of time from 100 rental properties that he owned and that he possessed the money for a "long time." (Id. ¶¶ 7-8.) Brumby also said that the currency

was given to him by his brother, El Bey, who had withdrawn it from his bank account. (Id. ¶ 8.) El Bey, who was not at the scene, claims that Brumby never said that he had the currency in his possession for a "long time" and charges that the officers made racially motivated comments. (Doc. 9 at 3.) Despite their claims, neither Brumby nor El Bey has offered any evidence whatsoever that any portion of the currency resulted from any legitimate business. On the other hand, the Government has proffered un-contradicted evidence that Brumby owns only one parcel of property in Guilford County and that there is no registered business by the name of "Showtime Realty." (Doc. 1 Ex. A ¶ 11; Doc. 9 at 3; Doc. 36 at 5.)

The Drug Enforcement Administration ("DEA") adopted the seizure of the U.S. currency and the vehicle as illegal drug proceeds and instituted administrative forfeiture proceedings under statute. (Doc. 1 Ex. A ¶¶ 10-11.) Brumby filed claims of entitlement to the seized items and, as a consequence, the administrative forfeiture proceedings were terminated and this matter was referred to the United States Attorney's Office for judicial forfeiture. (Id.)

On April 10, 2007, the Government initiated this action by filing a Verified Complaint of Forfeiture alleging that the currency and vehicle were used or intended to be used in

connection with a controlled substance exchange. (Doc. 1 ¶¶ 1-3.)

Beginning August 2, 2007, El Bey filed a series of motions and demands seeking the seized items.[1] (Docs. 9, 10, 12, 29, 31, 38.) He also filed a motion for default (Doc. 14), which was mooted by an extension granted to the Government (Doc. 19) and by the Government's current motion (Doc. 17).[2] Those were followed by similar, but tardy, motions and demands by Brumby. (Docs. 21, 24.)

The Government moves to dismiss El Bey's various claims on the ground that he lacks standing to assert them (Doc. 17) and to strike Brumby's claims on the ground that he filed them untimely (Doc. 26). The Government also moves to amend the Complaint to correct the vehicle identification number.[3] (Doc. 15.) Finally, if the matter proceeds, the Government moves to compel responses to discovery served on El Bey. (Doc. 34.)

---

[1] El Bey also requested an injunction to prevent the Government "from making or supporting any form of slanderous and libel statements . . . against [him] or his Aboriginal heritage and proclamation of the Sovereignty of the free American Citizens and Nationals." (Doc. 31 at 6.) For the reasons set forth in Section II.A.1 infra, the court denies this request as frivolous.

[2] Default is also denied on the grounds that it is prohibited against the United States unless the claimant establishes a claim or right to relief by evidence satisfactory to the court. Fed. R. Civ. P. 55(d).

[3] It does not appear this motion has been ruled upon, and so it is granted herein.

4

## II.  ANALYSIS

### A.   El Bey's Claims

To seek return of seized property, a claimant must prove an interest in it sufficient to establish standing.  United States v. 526 Liscum Drive, 866 F.2d 213, 216 (6th Cir. 1989).  In the absence of standing, there is no "case or controversy."  United States v. 5201 Woodlake Drive, 895 F. Supp. 791, 793 (M.D.N.C. 1995) (quoting United States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1543 (11th Cir. 1987)).  In the civil forfeiture context, standing derives from two sources:  statutes and Article III of the U.S. Constitution.  United States v. U.S. Currency, in the Amount of $103,387.27, 863 F.2d 555, 560 n.10 (7th Cir. 1988).  A claimant must establish both.  United States v. $487,825.00 in U.S. Currency, 484 F.3d 662, 664 (3d Cir. 2007).

The Government does not contest that El Bey has statutory standing under 18 U.S.C. § 983.  (Doc. 17 Ex. A at 5.)  The central issue therefore is whether El Bey has demonstrated constitutional standing to contest the seizure.  Article III standing exists only if the claimant "has a legally cognizable interest in the property that will be injured if the property is forfeited to the government."  $38,000.00 in U.S. Currency, 816 F.2d at 1543 n.12.  A claimant must show some direct injury that is real and immediate, and not conjectural or hypothetical.

5

<u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-02 (1983).
"Courts generally do not deny standing to a claimant who is
either the colorable owner of the [property] or who has any
colorable possessory interest in it." <u>United States v. Contents
of Accounts Nos. 3034504504 and 144-07143</u>, 971 F.2d 974, 985 (3d
Cir. 1992).

Courts differ on the applicable test to determine whether a
claimant has a possessory or ownership interest in the seized
property for purposes of establishing standing to contest a
civil forfeiture. While some "courts have . . . considered an
affirmation or statement under oath that one is the owner of
seized property sufficient to establish standing," other courts
require the claimant to proffer "some evidence of ownership
interest." <u>United States v. Funds from Prudential Sec.</u>, 300 F.
Supp. 2d 99, 106-07 (D.D.C. 2004) (listing courts that ascribe
to each test). In applying the second test, courts "generally
look to dominion and control, such as possession, title, [and]
financial stake, as evidence of an ownership interest." <u>Id.</u> at
107 (internal quotation marks and citation omitted).

Though there is no published Fourth Circuit opinion
adopting either test for civil forfeitures, the Fourth Circuit
would almost assuredly apply the "dominion and control" test,
which it has applied in an unpublished civil forfeiture opinion

6

and in the criminal forfeiture context.[4]  United States v. 1077
Kittrell Street, No. 90-2759, 1991 U.S. App. LEXIS 26463, at *5-
6 (4th Cir. Nov. 7, 1991); United States v. Bryson (In re
Bryson), 406 F.3d 284, 291 (4th Cir. 2005) (criminal
forfeiture); United States v. Morgan, 224 F.3d 339, 343 (4th
Cir. 2000) (same).

Although legal title is an indicium of ownership under the
dominion and control test, "[b]are legal title, standing alone,
is insufficient to confer standing upon a claimant." 1077
Kittrell Street, 1991 U.S. App. LEXIS 26463, at *5; see also
Morgan, 224 F.3d at 343 (ruling, in the criminal forfeiture
context, that "[f]ailing to look beyond bare legal title or
whether the petitioner has a property interest under state law
would foster manipulation of ownership by persons engaged in
criminal activity."). Courts also have looked for the following
indicia, among others, in connection with vehicles: (1)
statements of ownership or possession, United States v. One 1990
Chevrolet Corvette, 37 F.3d 421, 422 (8th Cir. 1994); United

---

[4]   District courts within the Fourth Circuit have also applied the
"dominion and control" test in civil forfeiture actions. E.g., United
States v. 328 Pounds, More or Less, of Wild Am. Ginseng, 347 F. Supp.
2d 241, 246 (W.D.N.C. 2004); United States v. Real Prop. Described in
Deeds Recorded at Book/Page 639/846, 639/840, 639/834, 639/827, and
610/727, 962 F. Supp. 734, 737 (W.D.N.C. 1997); 5201 Woodlake Drive,
895 F. Supp. at 793-94; United States v. 1990 Chevrolet Silverado
Pickup Truck, 804 F. Supp. 777, 782-83 (W.D.N.C. 1992); United States
v. 349 S. 4th Avenue, 792 F. Supp. 36, 40-41 (E.D. Va. 1992).
Furthermore, the civil forfeiture statute defines "owner" as excluding
"a nominee who exercises no dominion or control over the property."
18 U.S.C. § 983(d)(6)(B)(iii).

States v. Vehicle: One 1990 Nissan Pathfinder, No. 92-CV-1336, 1994 U.S. Dist. LEXIS 12264, at *11-12 (N.D.N.Y. Sept. 2, 1994); (2) who regularly drives the vehicle, United States v. One 1995 Chevrolet Suburban, No. C05-0010, 2006 U.S. Dist. LEXIS 74217, at *7-8 (N.D. Iowa Oct. 11, 2006); United States v. 2001 Honda Accord EX, 245 F. Supp. 2d 602, 610 (M.D. Pa. 2003); One 1990 Nissan Pathfinder, 1994 U.S. Dist. LEXIS 12264, at *12; (3) who pays for insurance coverage, 2001 Honda Accord EX, 245 F. Supp. 2d at 610; United States v. One 1986 Chevrolet Monte Carlo, 817 F. Supp. 729, 732 (N.D. Ill. 1993); (4) who pays for maintenance and repairs, One 1995 Chevrolet Suburban, 2006 U.S. Dist. LEXIS 74217, at *8; (5) who possessed the vehicle when it was seized, 2001 Honda Accord EX, 245 F. Supp. 2d at 610; (6) who maintains control over the keys to the vehicle, id.; and (7) familiarity with the features and controls of the vehicle, One 1990 Chevrolet Corvette, 37 F.3d at 422; One 1995 Chevrolet Suburban, 2006 U.S. Dist. LEXIS 74217, at *8. Thus, even legal owners of property must demonstrate some dominion or control or other indicia of true ownership beyond mere legal title. 1077 Kittrell Street, 1991 U.S. App. LEXIS 26463, at *5; see United States v. Cambio Exacto, S.A., 166 F.3d 522, 527 (2d Cir. 1999) (holding that the key is whether claimant suffers injury and not just whether he or she is an owner).

The burden of establishing standing rests with the claimant, <u>United States v. $121,100.00 in U.S. Currency</u>, 999 F.2d 1503, 1505 (11th Cir. 1993); <u>328 Pounds, More or Less, of Wild Am. Ginseng</u>, 347 F. Supp. 2d at 245-46, and must be supported at each stage of the litigation, <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).

### 1. U.S. Currency

El Bey cannot establish constitutional standing to contest the forfeiture of the defendant currency. On August 2, 2007, El Bey filed an "answer" to the complaint of forfeiture, as well as a demand for return of the defendant currency. (Docs. 9, 10.) He claims the release of the defendant currency under 18 U.S.C. § 983(f) on the grounds that he has a possessory interest in it by virtue of an international treaty. (Doc. 9 at 1, 4; Doc. 10 at 2.) El Bey subsequently claimed to have a power of attorney from Brumby, who is the apparent owner of the currency. (Doc. 38 at 2, Ex. A.) In an addendum to a motion for summary judgment, sworn under the penalty of perjury, El Bey has attached what purport to be receipts from a Wachovia Bank in Greensboro, North Carolina, reflecting transactions to account for withdrawal of $4,900.[5] (Doc. 38 Ex. C.)

---

[5] The purported receipts are highly suspicious. For example, they purport to reflect a deposit of $300,000 on November 16, 2006, withdrawals (or funds available for withdrawals) in the separate amounts of $295,000 and $4,900 as of November 18, 2006, and an available balance of $200,000 on November 20, 2006, at 10:43 a.m.

Fatal to El Bey's claims are his admissions that he enjoys neither an ownership nor a possessory interest in the defendant currency, which was seized from Brumby, the only occupant of the vehicle. To the contrary, El Bey makes clear that the currency belonged to Brumby. In specific, El Bey claims:

> the [defendant] currency . . . was withdrawn from a Wachovia Bank account on 11/18/2006 in the amount of 4,900 dollars, the rest being $2,100 dollars which was provided by Kendal Brumby aka Ken d El Bey [Native American Appellation] to Joseph Brumby to open a separate bank account.

(Doc. 9 at 1.) El Bey further explains that:

> [Brumby] was going to deposit the money [in] his account and had collected the money over long periods of time from business ventures as a laborer for Kendal Brumby, however the money had been collected and placed in the bank. Joseph Brumby NEVER stated he had the money in his PHYSICAL possession for a long time, but that he had ACQUIRED the money over a long period of time through Labor. . . .
>
> . . . By possession of the money Joseph Brumby meant that the money was his, owed to him and acquired by labor and that he had been paid by the Kendal Brumby aka Ken d El Bey [Native American Appellation] who has [sic] withdrawn the money two days earlier 11/18/06 in the amount of $4,900 . . . and he [Joseph Brumby] was on his way to deposit the money into an account.

(Id. at 3.) Based on these admissions, El Bey relinquished any right he may have had to the currency, thereby giving up any

---

(suggesting an interim unexplained withdrawal of $100,000). (Doc. 38 Ex. C.) All balances are in exact dollar figures, without any accounting for accrued interest, and the name of the bank location is misspelled. It is listed as "6OUR SEASONS (W)," whereas the name of the location is "FOUR SEASONS." (Id.)

right to dominion or control over it. He therefore lacks standing to seek its return. United States v. One 1971 Porsche Coupe Auto., 364 F. Supp. 745, 748 (E.D. Pa. 1973) (holding that father who gave car to son as a gift could not oppose its forfeiture).

El Bey also fails to demonstrate any possessory or ownership interest by virtue of his elaborate filings alleging international treaty rights. In his pleadings, El Bey claims to be a United States citizen and a member of the "International Society of Indigenous Sovereigns Abannaki Aboriginal Nation," which he alleges is "a Native American Nation recognized by the Federal Government [Department of State authentication document 06013144-1]." (Doc. 9 at 1; see id. at 4; Doc. 10 at 2.) In support of this claim, El Bey has filed multiple documents that purport to be official papers of recognition from the "International Indigenous Society of Abannaki Aboriginal Tribal Council," the U.S. Department of State, the Commonwealth of Pennsylvania, and other entities. (Doc. 9 Ex. A; Doc. 20 Ex. A.) He also filed alleged diplomatic identification cards from the Great Seal National Association of Moorish Affairs (Moorish Nation), the International Society of Indigenous Sovereigns ("ISIS"), and the Washitaw. (Id.) As an alleged member of the Abannaki, El Bey claims to be a beneficiary of the Treaty of Watertown of 1776 between the Abannaki Miqmaq Tribe and the

United States. (Doc. 9 at 4; Doc. 10 at 2.) Based on this alleged tribal membership and treaty, El Bey argues that the defendant currency was proceeds from his labors as a tribal minister and that he has a "perfected priority possessory interest" in such currency, pursuant to North Carolina's Uniform Commercial Code, N.C. Gen. Stat. §§ 25-9-310(a), 25-9-311 and 25-7-103, and 8 U.S.C. § 1401. (Doc. 9 at 1, 4; Doc. 10 at 2.)

These arguments are so completely and utterly without merit that they are an affront to this court and to anyone of Native American heritage. As an initial matter, El Bey has not demonstrated that the Treaty of Watertown has any application whatsoever. The Treaty was a mutual defense agreement between the fledgling United States and the St. John's and Mi'kmaq Indian tribes of Nova Scotia, Canada, which was entered into shortly after the signing of the Declaration of Independence in 1776. The 1st American Treaty: The Treaty of Watertown, http://www.watertowntreaty.org/ (last visited Oct. 24, 2008). To the extent that Treaty is still in effect, it does not appear to apply to members of the Abenaki or to citizens of the United States. http://www.watertowntreaty.org/treatytext.htm.

Furthermore, El Bey has not shown that he is a member of the Abenaki.[6] His photo identification cards claim that he is a

---

[6] El Bey fails to use the commonly accepted spelling of Abenaki, instead spelling it Abannaki. Compare, e.g., (Doc. 9 at 1) with Native Languages of the Americas: Abenaki (Abanaki, Abenakis,

member of the Great Seal National Association of Moorish Affairs (Moorish Nation), Washitaw, and ISIS. (Doc. 20 Ex. A.) El Bey has not provided commonly accepted proof of tribal membership, such as his tribal enrollment certification, BIA Form 4432, or a copy of his tribal membership card (with an enrollment number, signature of authorizing official and seal). None of El Bey's other documents establishes his status as an Abenaki, either.[7] The reference to the Great Seal National Association of Moorish Affairs (Moorish Nation) and the Washitaw suggests that the ISIS Abannaki Aboriginal Nation is merely the most recent incarnation of a notorious organization of scofflaws and ne'er-do-wells who attempt to benefit from the protections of federal and state law while simultaneously proclaiming their independence from and total lack of responsibility under those same laws. <u>Sanders-Bey v. United States</u>, 267 F. App'x 464, 466 (7th Cir. 2008) (finding

---

Alnôbak), http://www.native-languages.org/abenaki.htm (last visited Oct. 24, 2008) (providing links to Abenaki tribal and community websites).

[7] These documents fail to prove that federal, state, or local officials have recognized the ISIS Abannaki Aboriginal Nation. Rather, even if they were true, they would demonstrate only that a series of governmental bodies have authenticated the seals of other entities. For example, the Department of State recognized the seal of the Commonwealth of Pennsylvania, Pennsylvania recognized the seal of the Prothonotary of the Court of Common Pleas of Philadelphia County, the Prothonotary acknowledged the signature of a notary public on a document titled "Copy Certification by Document Custodian", in that the document custodian is "an official witness of International Society of Indigenous Sovereigns [ISIS]" and by his signature on the "Copy Certification" the custodian purports to authenticate a photocopy of "Status Documents". (Doc. 20 Ex. A.) No such status documents are attached, however.

that "the Washitaw Nation . . . is not recognized by the United States government"); <u>Bybee v. City of Paducah</u>, 46 F. App'x 735, 736-37 (6th Cir. 2002) (finding that the "Nation of Washitaw" is "fictional"); <u>United States v. Gunwall</u>, No. 97-5108, 1998 U.S. App. LEXIS 18596, at *11 (10th Cir. Aug. 12, 1998) (rejecting claim that the court had no jurisdiction over a member of the Washitaw as "frivolous"); <u>Bey v. Louisiana</u>, No. 08-cv-0250, 2008 WL 4072747 (W.D. La. July 11, 2008) (finding that plaintiff's claim to land as a member of the Washitaw was "patently frivolous" and rested on documents of "dubious legal significance"); <u>Great Seal Nat'l Ass'n of Moorish Affairs v. 46th Dist. Ct. of Oakland County</u>, No. 06-CV-15625, 2007 U.S. Dist. LEXIS 3199, at *2 (E.D. Mich. Jan. 17, 2007) (dismissing claim that plaintiffs owned several parcels of property by virtue of their Moorish ancestry as "baseless, fantastic, and delusional" and finding the complaint to be "indecipherable"); <u>Khattab El v. U.S. Justice Dep't</u>, No. 86-6863, 1988 U.S. Dist. LEXIS 544, at *5 (E.D. Pa. Jan. 22, 1988) (holding that "the United States has not recognized the sovereignty of the Moorish Nation, thus precluding sovereign immunity claims").

Even if El Bey were a member of the Abenaki, he has not demonstrated his immunity from the civil forfeiture statutes of the United States. Federal statutes of general applicability presumptively apply to individual Indians and Indian tribes,

absent some clear indication that Congress did not intend for them to be subject to the legislation. Fed. Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 116, 120 (1960); Taylor v. Ala. Intertribal Council Title IV J.T.P.A., 261 F.3d 1032, 1035 (11th Cir. 2001); EEOC v. Fond du Lac Heavy Equip. & Constr. Co., 986 F.2d 246, 248 (8th Cir. 1993). The civil forfeiture statute contains no such express or implied exemption for Indians. Furthermore, the Abenaki are not a federally recognized tribe that is eligible for certain funding and services. 73 Fed. Reg. 18,553, 18,553 (Apr. 4, 2008). In fact, just last year the U.S. Bureau of Indian Affairs rejected an application for federal recognition filed by the St. Francis/Sokoki Band of Abenakis of Vermont. 72 Fed. Reg. 36,022, 36,022 (July 2, 2007).

Finally, El Bey may not rely on Brumby's ownership interest to assert standing to contest the forfeiture of the defendant currency. On February 26, 2008, El Bey filed an "Addendum to Motion for Summary Judgment," claiming that almost six months earlier Brumby had given him a power of attorney over the "[m]onies took from Joseph Brumby Jr. on 11/20/06." (Doc. 38 at 2, Ex. A at 3, 4.) The power of attorney claims to authorize El Bey to engage on Brumby's behalf in tangible personal property transactions, banking transactions, and litigation involving the defendant currency. (Doc. 38 Ex. A at 1-2.) Although Brumby

15

purportedly executed the power of attorney on September 15, 2007 (<u>id.</u> at 4), El Bey mentioned it for the first time in this pleading.

The Addendum, apart from its highly suspicious facial appearance, seems to constitute a transparent attempt either to cure Brumby's late claims or to contradict El Bey's initial claims to the defendant currency in order to cure his lack of standing.   Brumby's claim is addressed in Section II.B below. As to the latter, it is reminiscent of the Abbott and Costello "Who's on first?" routine.   El Bey has already staked himself out on the position (under penalty of perjury) that at the time of seizure the currency was Brumby's.   (Doc. 9.)   The power of attorney, even assuming its validity, only allows El-Bey to act as agent for Brumby, the grantor.   Black's Law Dictionary 1209 (8th ed. 2004) (defining the instrument as only authorizing another to act as one's agent); <u>Pecheles v. Pecheles (<i>In re</i></u> <u>Pecheles)</u>, No. 97-2428, 1998 U.S. App. LEXIS 12723, at *2 (4th Cir. June 15, 1998).   El Bey cannot now claim to have dominion and control over the currency himself simply by asserting Brumby's rights over it.   Thus, El Bey may not rely on the power of attorney to claim his standing to contest the forfeiture of the defendant currency.

Based on this record, the court finds that El Bey has failed to demonstrate constitutional standing over the defendant currency.

### 2. Vehicle

El Bey also cannot establish standing for the defendant vehicle. In the initial claim and answer, which were filed on August 2, 2007, El Bey purports to have a possessory interest in the vehicle, pursuant to his "treaty rights."[8] (Doc. 9 at 1, 4; Doc. 10 at 1-2.) He also claimed to have a power of attorney from the apparent owner, Nadir Yarbrough, to defend against legal proceedings affecting the vehicle (Doc. 9 at 1), although no power of attorney surfaced for approximately another seven months (Doc. 38 Ex. B).[9]

These attempts fail to constitute a sufficient possessory or ownership interest to demonstrate standing under the "dominion and control" test. The "treaty rights" are bogus, as earlier explained. El Bey provides absolutely no evidence regarding his dominion and control for purposes of his alleged possessory interest in the vehicle. His only claim to an

---

[8] El Bey never claims to be the owner of the vehicle, and the Government has provided an affidavit indicating that the North Carolina Department of Motor Vehicles confirms that he neither is the registered owner nor has a lien upon it. (Doc. 17 Ex. A at 1-2.)

[9] The power of attorney bears the hallmarks of a false document. Most notably, the signature of the maker, Nadir Yarbrough, is obviously misspelled, and the document was dated October 15, 2006, a month prior to the seizure herein. (Doc. 38 Ex. B at 4.)

ownership interest is the power of attorney from Yarbrough, who holds legal title to the vehicle. As a matter of law, whatever rights El Bey would claim under a power of attorney are necessarily derivative of those of Yarbrough. As discussed above, however, "[b]are legal title, standing alone, is insufficient to confer standing upon a claimant." El Bey has proffered no evidence of any other indicia of Yarbrough's dominion and control over the vehicle. To the contrary, the record indicates that Brumby exhibited several indicia of dominion or control, including possession of the vehicle at the time of its seizure and control over the keys to the vehicle.

Based on this record, the court finds that El Bey has not demonstrated that he has dominion and control over the defendant vehicle. Therefore, El Bey lacks standing to assert any interest in the seized vehicle, and his claim for this property is dismissed.

**B.    Brumby's Claims**

Apparently emboldened by El Bey's multiple filings in this case, Brumby filed his own claims to the seized defendant properties on October 29 and November 26, 2007. (Docs. 21, 24.) Like El Bey, Brumby filed these claims under an alias, Yasir Justice El Bey, and requests the return of the defendant currency and vehicle under the same bogus ground of a federal treaty and North Carolina's Uniform Commercial Code, pursuant to

18

18 U.S.C. § 983(f).[10]  (Doc. 21 at 1-2; Doc. 24 at 1.)  The Government seeks to deny these claims, asserting that Brumby lacks statutory standing to contest the forfeiture because his claims do not contain the requisite information and were filed well after the applicable deadlines.[11]  (Doc. 23 at 4-6.)  The Government subsequently moved to strike the claims, pursuant to Rule G(8)(C)(i)(A) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims ("Supplemental Rules"), because they were untimely.  (Doc. 27 at 3.)

    Rule G(5)(a) of the Supplemental Rules imposes a deadline on the filing of a claim for seized defendant property.[12]  Supp. R. G(5)(a)(ii)(A).  This Rule allows potential claimants who receive direct notice of the forfeiture to file their claims by

---

[10]  Like El Bey, Brumby claims to be a member of the ISIS Abannaki Aboriginal Nation.  (Doc. 21 at 1-2, Ex. A.)  Brumby attaches the same documents and certifications from the U.S. Department of State, the Commonwealth of Pennsylvania and notaries public of the Commonwealth of Pennsylvania, allegedly proving that his organization is a federally recognized Indian tribe.  (Doc. 21 Ex. A.)  Brumby also attaches similar photo diplomatic identification cards, allegedly indicating that he is a member not only of ISIS, but also of the Washitaw.  (Id.)

[11]  The Government also seeks to deny or dismiss the request as premature, frivolous and moot because Brumby failed to satisfy the statutory criteria for the return of the seized defendant property. (Doc. 23 at 6-13.)

[12]  The Government relies on Supplemental Rule G(5), which took effect on December 1, 2006, to establish the filing deadline.  In an Order dated April 12, 2006, the U.S. Supreme Court stated that Supplemental Rule G "shall govern in all proceedings hereafter commenced and, insofar as just and practicable, all proceedings then pending." Although the seizure took place in November 2006, the Government did not commence the forfeiture complaint in this court until April 2007. Thus, Supplemental Rule G applies to this proceeding.

the date set forth in the notice, which must be "at least 35
days after the notice is sent."[13]   Supp. R. G(5)(a)(ii)(A),
(4)(b)(ii)(B).   The court may strike a claim for failing to
comply with this filing deadline.  Supp. R. G(8)(c)(i)(A).

In this action, Brumby was served with direct notice, a
copy of the Verified Complaint of Forfeiture and related
documents on July 13, 2007.  (Doc. 8.)   The Government informed
Brumby that he could file a verified claim within thirty-five
days after the date of the letter, which was sent on July 2,
2007.  (Doc. 27 Ex. A.)   Brumby therefore had until August 6,
2007, to file a claim in this forfeiture proceeding.[14]   But
Brumby filed nothing until October 29, 2007, when he filed a
"Request to Release Seized Property" (Doc. 21) and November 26,
2007, when he filed a "Demand by Affidavit and Notice for Return
of Property" (Doc. 24).   In both cases, Brumby's filings are

---

[13]  Congress imposed a time limit on the filing of a claim for seized
defendant property under the Civil Asset Forfeiture Reform Act, which
was codified at 18 U.S.C. § 983.   When the Government files a
complaint for the forfeiture of property in a district court, as it
did here, section 983 provides that any person may file a claim
asserting an interest in the seized property "*not later than 30 days
after the date of service of the Government's complaint.*"  18 U.S.C. §
983(a)(4)(A) (emphasis added).   Although this thirty-day deadline
appears to conflict with the thirty-five day deadline set forth in
Supplemental Rule G, Rule G prevails because it took effect after
section 983(a)(4)(A).  28 U.S.C. § 2072(b) (2006).

[14]  The Government contends that Brumby had until August 17, 2007 to
file a verified claim (Doc. 23 at 5; Doc. 27 at 3), apparently
calculating the date from the receipt of the letter (Doc. 8 Ex. A).
However, Supplemental Rule G, as well as and the Government's direct
notice, appear to calculate the filing deadline from the date the
notice was sent to Brumby.  Supp. R. G(5)(a)(ii)(A), (4)(b)(ii)(B);
(Doc. 27 Ex. A).

untimely and are, on that basis, stricken, pursuant to Supplemental Rule G(8)(c)(i)(A).[15]

## III. CONCLUSION

For the reasons set forth above, it is ORDERED that:

1. El Bey's Motions for Return of Property (Docs. 10, 29) and Motions for Summary Judgment (Docs. 12, 31) are DENIED;

2. El Bey's Motion for Default Judgment (Doc. 14) is DENIED as moot;

3. El Bey's Motion for Injunctive Relief (Doc. 31) is DENIED;

_____

[15] Courts typically require strict compliance with the procedural requirements of Supplemental Rule G, as well as its predecessor Supplemental Rule C. E.g., United States v. $5,730.00 in U.S. Currency, 109 F. App'x 712, 714 (6th Cir. 2004); United States v. Commodity Account No. 549 54930, 219 F.3d 595, 598 (7th Cir. 2000); United States v. One Hundred Four Thousand Six Hundred Seventy-Four Dollars ($104,674.00), 17 F.3d 267, 269 (8th Cir. 1994). Although a court has the discretion to extend the filing deadline for "good cause," Supp. R. G(5)(a)(ii), Brumby has not identified any such circumstances. In considering the relevant factors, the court finds no basis for excusing Brumby from compliance with the filing deadline because he was aware of the seizure, never suggested that the Government encouraged the delay, provided no reasons for the delay, did not advise the court and the Government of his interest in the property before the claim deadline, and failed to demonstrate that the Government would not be prejudiced by a late filing. E.g., United States v. Thirty-Five Firearms, 123 F. App'x 204, 207 (6th Cir. 2005). Even though Brumby filed claims in the administrative forfeiture action (Doc. 1 Ex. A at 4), "those claims are not a substitute for filing a verified claim in the judicial forfeiture action because summary administrative forfeitures and judicial forfeitures are separate proceedings." United States v. $48,000 U.S. Currency, No. 06-10952, 2007 U.S. Dist. LEXIS 36632, at *8-9 (E.D. La. May 18, 2007).

4. Brumby's Motion to Release Seized Property (Doc. 21) and Demand by Affidavit and Notice for Return of Property (Doc. 24) are DENIED;

5. The Government's Motion to Amend Complaint (Doc. 15) is GRANTED;

6. The Government's Motion to Dismiss (Doc. 17) is GRANTED;

7. The Government's Motion to Strike the claim of Brumby (Doc. 26) is GRANTED; and

8. The Government's Motion to Compel Response to Discovery (Doc. 34) is DENIED as moot.

<u>    /s/    Thomas  D. Schroeder</u>
United States District Judge

October 30, 2008